Glen W. PHILLIPS, Appellant,

v.

SUNTEX OIL & GAS COMPANY et al., Appellees.

No. 7703.

Court of Civil Appeals of Texas.

Amarillo.

April 3, 1967.

Rehearing Denied May 8, 1967.

Gibson, Ochsner, Harlan, Kinney & Morris, John E. Morrison, Jr., Amarillo, for appellant, Sansing & Sansing, Higgins, of counsel.

Lemon, Close & Atkinson, Edward L. Atkinson, Perryton, for appellees, Gordon Llewellyn, Dallas, of counsel.

CHAPMAN, Justice.

This is a suit by Glen W. Phillips seeking a declaratory judgment construing an oil and gas mineral lease executed by him and his wife, Gladys L. Phillips, to Paul M. Haywood on July 18, 1955, on the west half, the northeast quarter, and the south half of the southeast quarter of Section 1163, Block 43, H. & T. C. R. R. Co. Survey of Lipscomb County.

If the named lease was valid and subsisting at the institution of the suit and at all material times herein the leasehold estate created thereby was owned by appellee, Suntex Oil & Gas Company, Paul M. Haywood and Lorene Haywood, Texas Bank and Trust Company of Dallas, Texas,

and John B. Stigall, Jr., as Trustee for said bank and trust company. Suntex, as the oil company will be hereinafter referred to, was the owner of the working interest, the Haywoods were owners of certain overriding royalty interests carved out of the leasehold estate created by said lease, and the bank and trust company and John B. Stigall, Jr., as Trustee, were the owners of certain lien and security interests covering the leasehold estate created by the lease.

A motion for summary judgment was granted by the trial court in favor of the named defendants, and Glen W. Phillips has appealed.

The Phillips' lease to Haywood of July 18, 1955, of 560 acres, more or less, provided for a primary term of ten years, with the customary delay rental clause. Rentals were tendered to the depository bank and accepted on or before the eighteenth day of July of each year during the primary term. On July 17, 1965, appellant and his wife Gladys L. Phillips, by proper instrument extended the primary term of the described lease ten days, to July 28, 1965, at 12:00 o'clock midnight.

The rights of the parties appear to depend essentially upon the construction and application of Paragraphs 2 and 5 of the original lease from appellant and his wife to Haywood on July 18, 1955. There is no contention concerning the ten-day amendatory extension of the primary term to July 28, 1965, thus making the last named date the primary term expiration date. Paragraphs 2 and 5 are as follows:

"2. Subject to the other provisions herein contained, this lease shall be for a term of Ten (10) years from this date (called 'primary term') and as long thereafter as oil, gas or other mineral is produced from the land hereinabove described.

\* \* \* \* \* \*

"5. If prior to discovery of oil, gas or other mineral on said land Lessee should drill a dry hole or holes thereon, or if after discovery of oil, gas or other mineral all wells thereon should become incapable of producing for any cause, this lease shall not terminate if Lessee commences operations for additional drilling or for reworking within sixty (60) days thereafter or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of sixty (60) days from date of completion of dry hole or cessation of production. If at the expiration of the primary term there is no well upon said land capable of producing oil, gas or other mineral, but Lessee has commenced operations for drilling or reworking thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas, or other mineral, so long thereafter as oil, gas or other mineral is produced from said land."

On July 18, 1965, Suntex initiated operations by re-entry into a well drilled under a previous lease only to the Tonkawa Formation, cleaning out the old hole to 3,415 feet subsurface, and then drilling by due diligence to a subsurface depth of 6,330 feet. This well is referred to in the record as Suntex No. 1 Phillips. At said depth the well was determined on July 27, 1965, to be unproductive, and on said date plugged.

Appellees' motion for summary jugment, supported by affidavits of Gordon Llewellyn, president of Suntex, and Paul M. Haywood, field representative in charge of its Lipscomb County area, show that on July 28, 1965, being the last day of the primary term, the drilling rig was dismantled and laid down at the Suntex No. 1 Phillips Well location and sometime between 9:00 p. m. that day and 7:00 a. m., July 29, 1965, removed from such location. Haywood's affidavit also shows he erected a fence around the slush pit between July 29, 1965, and August 2, 1965, of Suntex No. 1 Phillips. Haywood's affidavit also shows

Suntex's drilling contractor, Unit Drilling Company, moved a drilling rig onto the location of the Suntex No. 2 Phillips Well on said lease on August 27, 1965, and commenced the installation and erection thereof. The well was spudded on August 28, 1965. Thereafter, operations were conducted with diligence to 6,410 feet and completed on September 20, 1965, as a well capable of producing gas or gas and condensate in paying quantities.

By instrument designated, "Answer Of The Plaintiff Glen W. Phillips To Suntex Oil And Gas Company's Paul M. Haywood's And Lorene Haywood's Motion For Summary Judgment," sworn to by its Amarillo attorney, appellant denied the drilling rig was laid down, dismantled and removed on July 28 and July 29, 1965, and denied any operations whatever were conducted by Suntex between the time the Suntex No. 1 Phillips Well was plugged on July 27, 1965, and August 27, 1965.

Shut-in gas royalties were tendered to the depository bank on September 13, 1965, and again tendered into the registry of the court on November 26, 1965. Initial delivery of gas from the Suntex No. 2 Phillips Well was made on April 26, 1966, and it was still continuing its production in paying quantities on the date of hearing in the trial court.

Under the record before us, we hold the trial court properly granted the summary judgment. Rule 166–A–(b), V.A.T.R., provides, inter alia, that a party against whom a declaratory judgment is sought " * * * may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof."

Section (e) provides:

" * * * Supporting and opposing affidavits shall be made on personal knowledge, *shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated*

*therein.* Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits." (All emphases added).

The affidavits made by Messrs..Llewellyn and Haywood appear to comply with the formal requirements so far as showing them competent to testify to at least the material matters about which they were swearing. The former stated in his affidavit that he was president of Suntex, all records of the company are maintained at the corporation's principal office at 908 Southland Center, Dallas, Texas, under his direct control and supervision and that all factual matters set forth in the affidavit are within his personal knowledge or have been obtained from the records of Suntex maintained in the ordinary course of its business.

Mr. Haywood's affidavit shows it was his duty to supervise the work of the independent contractor performed upon the oil and gas leases owned by Suntex in Lipscomb County; that he personally supervised the subject lease; that the Suntex No. 1 Phillips was plugged and abandoned on July 27, 1965; that the drilling rig was dismantled, laid down, and moved from the location sometime between July 28, 1965, at 9:00 p. m. and July 29, 1965, at 7:00 a. m.; that he constructed and erected a fence around the slush pit at the location between July 29, 1965, and August 2, 1965; and that operations were commenced on Suntex No. 2 Phillips on August 27, 1965, under the subject lease.

 Appellant admits by brief there is no fact issue involved in the construction of the lease but he made no move for summary judgment, made no affidavit denying appellees' motion for summary judgment and affidavits in support thereof, and took no deposition. The factual matters constituting the answer heretofore mentioned, made by appellant's Amarillo at-

torney denying any operations between the plugging of the hole on July 27, 1965, and August 27, 1965, would not in our opinion be admissible in evidence. "* * * affidavits must be made by competent affiants with personal knowledge of the statements in them, *which statements must be so worded that if given on the witness stand they would be admissible in evidence.*" Tobin v. Garcia, 159 Tex. 58, 316 S.W.2d 396 (1958). See also Chumchal v. Natural Gas Pipeline Co. of America, 381 S.W.2d 690 (Tex. Civ.App.—Corpus Christi, 1964, no writ); DuBose v. Parkdale Plaza Company, 408 S.W.2d 324 (Tex.Civ.App.—Corpus Christi, 1966, writ ref'd n.r.e.); Farmers State Bank v. First State Bank of Liberty, 317 S.W.2d 768 (Tex.Civ.App.—Waco, 1958, no writ); Gaston v. Copeland, 335 S.W.2d 406 (Tex.Civ.App.—Amarillo, 1960, writ ref'd n.r.e.); Sparkman v. McWhirter, 263 S.W.2d 832 (Tex.Civ.App.—Dallas, 1953, writ ref'd).

In our opinion the answer sworn to by appellant's Amarillo attorney does not comply with the plain wording of Rule 166–A–(e), V.A.T.R., by showing affirmatively that the affiant is competent to testify to the matters stated therein. In Kuper v. Schmidt, 161 Tex. 189, 338 S.W.2d 948 (1960) the Supreme Court of Texas has held: "When facts entitling the moving party to prevail have been established by affidavits, deposition testimony or admissions, the motion for summary judgment will not be denied merely because the opposite party has alleged matters which, if proved, would require that a different judgment be rendered. * * * If the defendants expected to defeat the motion for summary judgment * * * it was incumbent upon them to come forward with *'evidence'* *· * *.*" As we view the answer to the motion for summary judgment it is no more than allegations.

Obviously, the statements of fact made by appellant in a pleading and sworn to by his attorney, living and maintaining his office more than 100 miles from the lease, would not be admissible unless the attorney was present on the grounds and observed the lack of any operations from July 27, 1965, to August 27, 1965. In the absence of his personal presence at the lease site his personal knowledge in connection therewith could only be hearsay and inadmissible. His fiat nowhere states facts by which he had such personal knowledge, such as we believe is required by the cases cited in the two previous paragraphs and the plain wording of Rule 166–A–(e).

■ If facts asserted in an affidavit in the form made and through the wording used could not raise a fact issue so as to preclude summary judgment, Gaston v. Copeland, supra, then an answer to a motion for summary judgment lacking the same quality could not do so. Therefore, we must look to the other summary judgment evidence. The instrument just discussed would constitute a summary judgment component, Rule 166–A–(c), but in our opinion would not constitute summary judgment evidence such as to contradict affidavits which show affirmatively that the affiants are competent to testify to the facts stated therein; that the facts stated would be admissible in evidence on the trial of the case concerning which they were made, and which affidavits show the parties making them to be entitled to a judgment summarily rendered.

Haywood's and Llewellyn's affidavits taken together show Suntex No. 1 Phillips was plugged and abandoned as a well on July 27, 1965, but that operations continued at the well site by lowering, dismantling and moving the drilling rig from July 28, 1965, to 7:00 a. m., July 29, 1965, and that from July 29, 1965 to August 2, 1965, Haywood constructed a fence around the slush pit.

The habendum clause provides: "Subject to the other provisions herein contained, this lease shall be for a term of Ten (10) years * * * and as long thereafter as oil, gas or other mineral is produced * * "

The stipulation for a term of ten years and ten days characteristic of this lease " * * * is thus both modified and enlarged by the recital that it is subject to the other lease provisions, and is required to yield to any and all other provisions which affect the duration of the lease." Stanolind Oil & Gas Co. v. Newman Brothers Drilling Co., 157 Tex. 489, 305 S.W.2d 169 (1957). This being true, " * * * the lease may be kept in force after the end of the primary term * * * by the operation of its other provisions." Stanolind, supra.

The first sentence of Paragraph 5, as applicable to the facts of our case, provides: "If prior to the discovery of oil, gas or other mineral on said land, Lessee should drill a dry hole * * * thereon * * * this lease shall not terminate if Lessee commences operations for additional drilling * * * within sixty (60) days thereafter."

Even if it should be said arguendo that the activities of July 28 and 29, 1965, in dismantling and moving the rig and the construction of the fence around the slush pit between July 29, 1965, and August 2, 1965, did not constitute "drilling operations" within the meaning of the lease, when Suntex No. 1 Phillips was plugged and abandoned as a dry hole on July 27, 1965, the dry hole clause became operative, giving Suntex a sixty-day period in which to commence additional drilling operations. This it elected to do and Suntex No. 2 Phillips was commenced on August 27, 1965, well within the sixty-day period. However, various activities preliminary to actual spudding of a well have been held to constitute "drilling operations," such as selection of a drill site, placing timbers on the ground to be used in drilling operations, leveling the well location, and moving bulldozers and maintainers to selected well sites and the digging of pits and reservoirs. Guleke v. Humble Oil & Refining Co., 126 S.W.2d 38 (Tex.Civ.App.—Amarillo, 1939); Texas Co. v. Curry, 229 S.W.2d 643 (Tex. Civ.App.—Fort Worth, 1921); McCallister v. Texas Co., 223 S.W. 859 (Tex.Civ.App. —Fort Worth, 1920, writ ref'd); Petersen v. Robinson Oil & Gas Company, 356 S.W. 2d 217 (Tex.Civ.App.—Houston, 1962); Whelan v. R. Lacy, Inc., 251 S.W.2d 175 (Tex.Civ.App.—Texarkana, 1952, writ ref'd n. r. e.).

By the same token it would appear "drilling operations" are not concluded until the rig and other equipment are dismantled and moved off the location and the cleaning process connected with the drilling operations performed, such as fencing the slush pit.

Our Supreme Court in Stanolind said: " * * * the sixty-day clause can be effective only if the lease is in force at the time of the occurrence of the event which renders it operative." The event which rendered it operative in the sentence under discussion was the drilling of the dry hole prior to discovery of oil, gas or other mineral.

As was the case in Stanolind, the sixty-day clause deals with only two fact situations. The first is where a dry hole or holes are drilled prior to the discovery of oil or gas. The second is where after discovery of oil or gas, production ceases from any cause. The second clause is not applicable here. The Supreme Court of Texas in Stanolind held that the sentence comparable to our first sentence in Paragraph 5 provides that in either of the two fact situations mentioned the lease may be kept in force by additional drilling begun within sixty days.[1] The Court then stated: "By necessary implication the lease may be kept in force by the additional drilling or reworking operations in either fact situation whether occurring within or after the end of the primary term."

1. The lease was held to terminate in Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311 (1953), because neither of the two fact situations existed which authorized keeping it in force by additional drilling or reworking operations begun within sixty days.

■ The construction we have given to the lease in question is an equitable construction and gives the parties who have obviously spent considerable money on delay rentals and in seeking production an opportunity to save their lease. We believe a holding that it did not terminate will not do violence to any established legal principle. As a matter of fact, we believe our case is so analogous to St. Louis Royalty Co. v. Continental Oil Co., 193 F.2d 778 (5th Cir., 1952) and Stanolind it requires no application of equity to affirm the trial court.

■ We still have left the appellant's first two points, which urge error of the trial court in sustaining the motion for summary judgment despite his plea in abatement " * * * at a time which necessary and indispensable parties had not been made parties to the action." At the time appellant filed this suit on November 1, 1965, and issues had been joined by answers of all parties, Harry R. Staley and Flossie B. Staley owned 1/16 mineral interest in the 80-acre tract constituting the north half of the southeast 1/4 of the subject section and the leasehold estate under an oil and gas lease previously executed by appellant and his wife to them on August 5, 1959, covering the 80 acres.

On March 15, 1966, the Staleys executed an assignment in favor of Suntex whereby the August 5, 1957, oil and gas lease from appellant and wife to them covering the 80 acres was assigned to Suntex pertaining to gas and condensate down to and including the base of the Tonkawa Formation. In said assignment they reserved an overriding royalty of 1/8 of 7/8 of all gas and condensate produced from the assigned formations. Appellant and wife by instrument dated February 1, 1966, ratified, adopted and confirmed the August 5, 1957, lease as the same covers the rights assigned to Suntex.

On March 15, 1966, the Staleys executed a gas and condensate lease dated February 1, 1966, to Suntex covering the 1/16 mineral interest owned by them in the 80-acre tract as to gas, condensate and associated hydrocarbons down only to the Tonkawa Formation, reserving unto themselves 1/8 of the 7/8 royalty in addition to the customary 1/8. On March 15, 1966, they also executed a designation of gas unit whereby they unitized their 80 acres interest covering the August 5, 1957, mineral lease and February 1, 1966, gas and condensate lease with the remainder of that section. Additionally, the plaintiff, the Staleys and Northern Natural Gas Company entered into an agreement to permit the sale of gas during the period of this litigation. Pleadings of appellees sworn to by one of their counsel show that the Staleys were represented by appellant's attorneys in the stated negotiations and instruments. Some of the instruments were long and involved but a study of them indicates that in the event appellant prevails in this suit to terminate the lease title to the 80 acres will automatically revert and vest as it was on November 1, 1965, the date suit for termination was filed. It therefore follows that the instruments and negotiations which created the unitization and provided for the sale of gas during the pendency of this suit were negotiated and drafted in the light of the pending litigation.

The Staleys owned no interest in the Phillips No. 1 Suntex Well at the beginning of this litigation. The instruments show they will participate in production from said well only if appellees retain the July 18, 1955, lease and the producing well. A study of the record requires no indulgence of intendments favoring the summary judgment in order to find the Staleys consented to participate on the conditional basis just related, were well aware of the litigation, and contracted in reference thereto. This case thus appears to us to be distinguishable from the "parties" questions in Belt v. Texas Co., 175 S.W.2d 622 (Tex.Civ. App.—Amarillo, 1943, writ ref'd) and Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472 (1942) and thus not controlled by those

cases. If our interpretation of the lease is upheld by the Texas Supreme Court the Staleys could not be adversely affected. If we are not upheld, they will still be in the same position they were when the litigation was initiated, subsequent to which they negotiated and signed the only instruments that give them any right whatever to be parties to this litigation and at a time they were obviously conscious of its existence. In either event, they are in better position by not having been made parties in that they are free of legal fees and any other possible expense incident to the litigation.

Considered both from legal and equitable principles, we believe the case was properly disposed of by the trial court. The judgment is affirmed.